Benjamin W. Heard, plaintiff in error, *vs.* Russell & Potter *et al.*, defendants in error.

1. Objection made to the appointment of an auditor, with interlocutory bill of exceptions filed thereto at a previous term, may be incorporated and renewed in a motion for new trial, and error may be assigned thereon for refusing to grant the new trial because the appointment of the auditor was illegal—the report of such auditor having been admitted in evidence to the jury.

2. A bill calling agents to account for moneys expended in the purchase of two thousand bales of cotton, and the repurchase of other bales from time to time, for future delivery, to cover losses incurred in the first purchase, with various charges for cablegrams and telegrams, and exchange on Liverpool, is a bill involving matters of account, and an auditor thereon may be appinted·by the court, without consent of parties, under section 3139 of the Code—though the bill involve also other questions of disobedience of instructions and of fraud.

3. When the report of the auditor is filed in the clerk's office, and no order is passed in relation thereto, allowing time to except or otherwise, the party complaining may except in vacation before the trial term of the case; and the exceptions of law should then be ruled upon by the court, and the exceptions of fact submitted to the jury to be passed upon *seriatim.* It is error to try the case, not upon the exceptions of fact, but generally, and let the report on law, as well as fact, go to the jury as evidence.

4. On the submission of the case to the auditor under section 3139 of the Code, it is competent for him to investigate and state the account between the parties, to hear evidence on each item, to allow or disallow the same on law or fact, so far as may be necessary to state accurately the account—exceptions to his view of the law, which may include or exclude any item, to be passed upon finally by the court, and exceptions to his finding on the facts, which may exclude or include any item, to be passed upon finally by the jury.

5. On the trial before the jury the court should not charge them that the party excepting *is bound* by the auditor's report. The statute makes it only *prima facie* evidence.

6 Where the complainant waived discovery, and yet put in evidence portions of defendants' answer, the court was right to allow the defendants to read in evidence the balance thereof.

7. Where one of the questions made in the case was the imposition of the defendants upon the complainant in beguiling him into a cotton speculation, it is competent to show that he was not a tyro, but experienced in the cotton business and its speculations.

8. Where the case involved the employment of agents in Liverpool by

the agents of the complainant in Georgia, the cotton for the complainant, and he knew this all the time it was going on, the letters from complainant to his Georgia agents and theirs to him, and the letters of the foreign agents in respect to the whole cotton transactions *dum fervet opus*, while the transactions were going on, are admissible. They furnish the best evidence of the history of the case, and open it most fully to the jury.

9. Whether or not the factors had the right to sell the cotton on arrival, or as "spots," turned upon the contract and understanding of the parties, to be gathered from the evidence.

10. All securities placed to cover margin in the hands of the agents, on which they *bona fide* raised money to reimburse the Liverpool purchasers, constitute a fund from which they may reimburse themselves.

11. Any contract made by the agents, and ratified by the principal when reported to him, is binding upon him.

12. As a general rule, factors have a lien on the property of the principal in their possession for all advances made for them, and may sell to save themselves from loss; but, whether they have this lien or not in a particular case, or can sell at a particular time, may depend on contract, and if there be such a contract, it will govern.

13. An agent may recover from his principal moneys expended in the purchase of cotton futures for him at his instance and request, under the decision of this court in 45 *Ga.*, 507.

Equity. Auditor. Practice in the Supreme Court. Practice in the Superior Court. Evidence. Principal and agent. Contracts. Factors. Before Judge GIBSON. Richmond Superior Court. October Term, 1876.

This case was a bill in equity filed by Heard to prevent Russell & Potter from selling $35,000 of securities which he had deposited with them, as the receipt given shows, "as margin against the purchase of 2,000 bales of cotton in Liverpool." Heard claimed that his orders had not been obeyed, and that fraud had been practiced on him, by which a large portion of the loss had resulted, and that at most he was not liable for more than $23,570 loss, and that also a loss of $8,000 had accrued to him by one single act of disobedience in holding cotton when tendered instead of selling when tendered as ordered. He prayed for injunction,

relief, etc. Leech, Harrison & Forwood, of Liverpool, were also made parties defendant.

The principal errors complained of are these :

· The appointment of an auditor in a case where an appointment was unauthorized and illegal, the action of such auditor, the allowance of his report, or rather the overruling the exceptions thereto, the use of such report in the case, the admission of illegal evidence, erroneous charge, and refusals to charge, and a verdict against evidence, etc., the verdict being for over $6,000 for defendants. The entire transaction in Liverpool occurred in 1873, the margins being deposited as follows by Heard :

| | |
|---|---|
| January 31, 1873, in stocks. | $10,000 |
| March 25, 1873, in stocks and bonds | 10,000 |
| May 15, 1873, in stocks and bonds | 10,000 |
| July 2, 1873, in stocks and bonds | 5,000 |
| Total | $35,000 |

The bill made the following allegations, to-wit: That in December, 1873, he (complainant) had received from Russell & Potter notice that certain securities of par value of $35,000, deposited with them, would be sold on 1st Tuesday in February, 1874, and proceeds applied (according to said notice), after deducting expenses of sale, to payment of losses sustained by Leech, Harrison & Forwood on 2,000 bales of cotton, with expenses incurred by Russell & Potter as his (Heard's) agents, " to cover which losses said securities were deposited with us ;" that if said sale is had, great and irreparable loss must and will result to complainant, as immediate consequence of bad faith and fraudulent conduct of Leech, Harrison & Forwood, and want of proper obedience to instructions on part of Russell & Potter. That in consequence of opinions and convictions expressed to him by Russell & Potter as to favorable futures for cotton buyers, who might buy cotton for future delivery, complainant was induced to deposit with Russell & Potter, January 31, 1873, a bonus in bonds to amount of $10,000,

2

on March 25, 1873, $10,000 more, and on May 15, 1873, $10,000 more, each successive deposit being made on demand of Russell & Potter at the instance (as they said) of "our Liverpool friends," who had notified them that complainant's margin was nearly or quite exhausted; that complainant knew nothing whatever of the persons Russell & Potter had employed to represent them in buying and selling the 2,000 bales, nor does he know (further than the reports of Russell and Potter to him, enclosing statements of Leech, Harrison & Forwood) that ever a single bale was purchased on his account; that Russell & Potter say that the 2,000 bales were purchased on his account, and that Leech, Harrison & Forwood claimed the right and privilege to sell whenever the margin should be exhausted, or prove not sufficient to cover all loss; that four days after last deposit of $10,000, viz: May 19, 1873, complainant wrote to Russell & Potter to have his cotton held as long as they could upon the $30,000 bonus deposited, for he could and would put up no more; that May 20, 1873, Russell & Potter replied as follows: "We note you do not care to risk any more than your margin on the 2,000 bales of cotton in Liverpool, and when it is about consumed, in case the market should decline further, we will telegraph you and be governed by your immediate reply, whether to sell, or hold longer with an additional deposit of margin. As we have agreed, your cotton shall be held as long as you desire, so long as we are secured by proper margin, and in any event shall not be sold without previous consultation with you, and giving you an opportunity of holding, if you wish, by deposit of additional margin in case that now in hand should be consumed."

Again, they write as follows, in letter dated June 18, 1873, to-wit: "But, as you stated in a recent letter, that you did not care to lose any more than covered by your present marginal deposit, and, as at present prices, the value of the securities deposited is even now about consumed, and our friends, as you will see by the above extract, expect us to

keep covered against further losses, and the time rapidly approaches when the cotton will likely be tendered, we must ask you to place a further deposit in our hands, or we must be under the necessity (much against our wishes) of informing our friends that you decline to deposit any further margin, and the cotton is with them to sell at their discretion."

Again, on the 4th of July, 1873, they write as follows: " Or, thirdly, if you prefer this course, you can order the cotton for July-August delivery, to be received when tendered, and sold as spot cotton. And, if you will allow us to say it, we think this is the best course for you to pursue."

Further along in same letter, they write as follows, to· wit : " We shall ask the advice of our friends in Liverpool to-night, as to whether it will not be cheaper for you to re-· ceive the cotton than to transfer at 3-16d. difference. If they say it is cheaper, shall we instruct them to receive the cotton when tendered, and sell as received ? If you desire them to adopt the former course, we will understand you if you telegraph us thus—' Telegraph Liverpool receive and hold; I deposit proper margin.' But if you prefer the latter course, which we advise, we will understand if you telegraph thus—' Telegraph Liverpool receive and sell.' There are times when it is best to meet the loss squarely and have done with it—when it is cheaper *to pay at once in dollars* what seems an inevitable loss, and save in peace of mind the constant care and vexation of spirit that the · slow weeks bring." That, accordingly, on July 5, 1873, · (the next day) complainant telegraphed to Russell & Potter to receive and sell as spot cotton (that is, cotton on the spot and actually delivered), which dispatch Russell & Potter said they had received, and had " cabled on " to " our Liverpool friends ; " that after he had distinctly informed Russell & Potter that he was unwilling to, and would not, lose more than the $30,000 bonus up, he did, on July 2d, 1873, put up $5,000 more to meet any *future* loss, and not to go to any back loss, if there was any ; that thus, after being

notified to receive and sell as spot cotton, they clamor for more margin, giving reasons and offering inducements to Heard to put up more, and when he puts up $5,000 more to cover loss in the future, he is told, two days after, that his margin is gone, and unless $5,000 or $6,000 more is put up, Russell & Potter will notify their "Liverpool friends" to sell to save themselves; that complainant has been informed by Russell & Potter that 2,000 bales of cotton were purchased for him for future delivery, in January and February, 1873; that, until about July 10th, 1873, Russell & Potter claimed to be complainant's agents, but on the 7th day of August, 1873, they wrote to him that they had been acting merely as "inter-agents;" that complainant further alleges they could then have sold and saved any loss more than the margin up; that good faith and ordinary diligence were not exercised in this: that complainant's cotton was worth, at market price, never less than 8¾d, and at times 9d., and yet was sold by defendants at 8½d., and that when complainant, following the advice of Russell & Potter, telegraphed them to receive when tendered and sell, yet they did not do this, although they had agreed to follow his instructions, but held the cotton that had been tendered, at great expense, and sold that which had not yet been tendered at a heavy loss, amounting to at least $8,000; that defendants refuse to allow complainant to examine his letters written to them; that, although Russell & Potter claim that the cotton was sold in July, yet they furnish no account until October 23d, 1873, and then an imperfect and unsatisfactory account is rendered, not giving name of purchaser, etc., etc.; that, without any authority from complainant, his cotton was sold in July at $——, and a re-investment made at once, at $——, entailing a loss of $——; that complainant instructed Russell & Potter to receive his cotton as tendered and sell at once, but that instead of *selling*, they *held* the cotton, whereby a loss of $8,000 occurred, which should not be put against his collaterals, as it was occasioned by disobedience of his instructions; and if not

placed against his collaterals, he had plenty of bonus up, and the sale was unauthorized and unnecessary, and the loss thereby occasioned should not fall on complainant; that, instead of complainant owing defendants, they are indebted to him in the sum of $5,000 + $6,000 = $11,000 of collaterals; that, by their own admission, Russell and Potter have only paid out $23,000, and yet are trying to sell $35,000 of collaterals, although Leech, Harrison & Forwood owe complainant $7,000 or $8,000; that Leech, Harrison & Forwood are residents of Liverpool, England, and to allow a sale of complainant's collaterals, and oblige him to seek redress in the courts of a foreign power, will be against public policy and the rights of our own citizens; that said Leech, Harrison and Forwood are not represented in this state or country; that such sale being illegal (for aught complainant knows, Leech, Harrison & Forwood may be insolvent), he (complainant) is without adequate remedy at law, etc., etc. Prays for injunction restraining sale of securities by Russell & Potter, or delivery of the same to Leech, Harrison & Forwood, or payment to Leech, Harrison & Forwood by Russell & Potter of notes the latter have given on account of complainant, or other payments to them (Leech, Harrison & Forwood) of any moneys on said account; also, enjoining Russell & Potter from negotiating or disposing of said securities. Prayer for immediate injunction on legal grounds stated. Prayer for delivery to complainant of $5,000 last deposited, and payment of amount found on hearing that complainant has sustained by unskilful and fraudulent conduct of defendants, and for general account. Prayer for subpœna, etc.

Defendants filed their answer, in which they make the following allegations:

They admit giving notice of the sale, but deny that it will cause irreparable loss; deny all wasteful and fraudulent conduct, or bad faith, or want of strict obedience of instructions on the part of themselves, or of Leech, Harrison & Forwood, who, they admit and allege were their agents in

the matter. They admit having conversations with Heard before this transaction, January 31, 1873, but deny having used any wrongful means to induce him to enter into the business. They allege that they received an order from Heard to buy on his account 2,000 bales of cotton, April and May delivery, in Liverpool, at 9¾d., and cabled to Leech, Harrison & Forwood to buy accordingly for Heard (name not mentioned in cablegram) 2,000 bales cotton, and for themselves 500 bales. Received reply, January 29, 1873, that March-April (not April-May, as ordered) deliveries are 10d.; communicated this to Heard; the same day cabled to Leech, Harrison & Forwood to buy for a friend 2,000 bales, for themselves 500 bales, at not exceeding 10d., May-June delivery; that Leech, Harrison & Forwood, February 1st, 1873, report purchase of 1,400 bales of cotton at 10d., and 200 at 9 15-16d., on account of B. W. Heard, and on February 5 they report purchase of 2,000 bales at from 9 13-16d. to 10d. for account of Heard. That notice of this was given to Heard February 1, 1873, although report in full was made February 5, 1873. That market declined, and they required more margin of Heard; that he wrote them March 15, 1873, agreeing to put additional margin required; that March 20, Heard wrote that he wanted to forfeit the contract; that, as this could could not be done, on March 26 he put up $10,000. (He had previously put up $10,-000, not referred to in answer.) That April 28, 1873, Heard wrote that he should hold until last of summer until a better price prevailed; that cotton continued to decline, and that May 16 Heard deposited $10,000 more. They admit that Heard did not know or correspond with Leech, Harrison & Forwood, but allege that their names were furnished to him and his communicated to them (L. H. & F.) January 29, 1873; allege again that Leech, Harrison & Forwood are their (Russell. & Potter's) agents. They allege that, although Heard didn't know that any cotton was bought, yet that he was kept informed. They admit of receiving Heard's letter of May 19th and their re-

ply of May 20th, 1873. [Letters wherein Heard says he will lose no more than the $30,000 up, and to which they reply, admitting receipt of this notice, but saying they will not sell without notifying him.] They deny that the $5,000 margin, deposited July 2d, 1873, was put up against future loss only, but that in their letter of July 4th, 1873, they called for margin to cover a loss already accrued in exchanging, at Heard's request, July-August delivery to a delivery in September. They allege that Heard notified them July 10, 1873, declining to put up more margin, and that they cabled Leech, Harrison & Forwood that this was so; "protect yourselves; we have $10,000 margin, besides the £4,184 3s. 9d. already remitted." They deny that Heard lost $8,000 by the disobedience of instructions on the part of Leech, Harrison & Forwood, when (as alleged in bill) they were required to receive when tendered, and sell as spots. They explain their failure to show Heard his letters because it was inexpedient.

They allege that Leech, Harrison & Forwood's account sales are correct and in proper form. They admit that they know nothing of the actual transactions of Leech, Harrison & Forwood. Deny insolvency of Russell & Potter or of Leech, Harrison & Forwood, and allege insolvency of Heard. They claim that Heard owes them, as their agents, $13,677.99, in addition to $25,000 raised on his securities by hypothecation, or a total amount of $38,677.99, for which amount, less the value of his securities (par value, $35,000,) they pray judgment. They claim the contract was legal under the laws of Georgia, and allege that before the filing of this bill these securities were, with the knowledge of Heard, hypothecated, and that they gave the long notice to allow him time to redeem them.

Subsequently to the filing of the bill and answer, to-wit: at April term, 1875, counsel for defendants moved for the appointment of an auditor, which motion was resisted by counsel for Heard; but, April 23, 1875, the judge presiding passed an order appointing William T. Gould, Esq., as

auditor. At once counsel for Heard duly filed his excep-. tions thereto, which were certified to be true, and are as follows: "After argument on behalf of the objections, the court, without examination of the record, but relying upon the statement of counsel for the defendants, to the effect that the case was one demanding the appointment of an auditor, granted an order appointing an auditor in the case, notwithstanding counsel for plaintiff said he made no question upon the accuracy of the account, or its footing up, but was attacking the *bona fides* of the transaction, and objected to the appointment and refused to agree upon any person as auditor, to which ruling and decision counsel for complainant excepted at the time, and hereby excepts and prays that the same may be certified and allowed and spread upon the minutes of the court in terms of the law—Hook & Webb, attorneys for complainant." To which the following certificate was added, on same day, April 23, 1875: "The foregoing exceptions, examined by me, are hereby certified to be true and allowed; and it is further ordered that they be spread upon the minutes in terms of the statute." Signed by the presiding judge.

Counsel for complainant claim that this erroneous appointment of an auditor, and the subsequent action taken thereon, is the cause of the adverse verdict.

When the auditor held his session, counsel for Heard, the complainant, filed their protest is writing to his acting, on the ground that this was no case of complicated accounts, but that the issues made were fraud, illegality, and want of due diligence, none of which were proper issues for an auditor to try. Also, on the ground that the order appointing an auditor conferred no specific powers, and is too general, (it appointing him "with all the authority vested by law in auditors,") and that under such an order he could only adjust complicated accounts, and that as none such existed he had no actual power, etc.

Notwithstanding this, the auditor proceeded to act, overruling said protest, but embodying it in his report. Heard

did not testify before the auditor, his counsel believing that the auditor had no right to hear or decide issues of good or bad faith, disobedience or obedience of instruction, etc., made by the bill. .

The auditor, after hearing the evidence submitted before him, made a report  In this report, notwithstanding the objection made and protest filed against his passing on questions other than those of account, the auditor says, after setting out some circumstances indicating fraud: "In all this I see no sufficient evidence of fraud of which a charge should be clearly proved." It was urged that this remark unquestionably had great weight with the jury—should not have been made at all—and is in direct conflict with section 2751 of the Code, which says that fraud being subtle, slight circumstances may be sufficient to carry conviction of its existence. The auditor also, notwithstanding said objections and protest, reported that there was no failure to obey instructions.

Counsel for complainant duly excepted to this report, because it was an argument and not a report; because there was no complication of accounts, in which case only he could have reported; because the report assumed the deposits were for purchase of cotton for future delivery, for which assumption there was no evidence; because it was not accompanied by any brief of evidence; because it asserts that the whole 2,000 bales were in fact purchased and delivered, which by defendant's witness Forwood (the only person who has actual knowledge of the transaction in Liverpool,) is admitted to be untrue, he testifying, in answer to third direct interrogatory, says: "Only 200 bales were actually received." Exceptions were also taken to assumption on part of auditor that the $35,000 margin was exhausted in July and August, 1873, and that Leech, Harrison & Forwood sold at a heavy loss to save themselves, when there is no evidence to prove it, and it is in fact untrue; because the auditor, against protests and objections of Heard's counsel, passed on questions of bad faith and disobedience of instructions; because the auditor

assumes that failure of Leech, Harrison & Forwood to an-
nex to their answers to interrogatories two important let-
ters, one in which Russell & Potter, who had been employed
and trusted by Heard, wrote to Leech, Harrison & Forwood
that they had acted in their (Leech, Harrison & Forwood's)
best interest, and the other of similar purport, were not, un-
der the circumstances, a badge of fraud; because the audi-
tor assumes that there is no difference between the instruc-
tions given by Heard to Russell & Potter (by advice of
latter) "to receive when tendered and sell as spots," and the
instructions by Russell & Potter, thereon given to Leech,
Harrison & Forwood, "sell cotton account Heard fast as
tendered; do your best." [The first instructions were to
receive as tendered and sell as delivered. The one trans-
mitted was to sell as tendered without requiring delivery.]
Because the auditor assumes that the usual rule relating to
factors giving right to sell when margin was nearly or actu-
ally exhausted, applies, and that such was this case, whereas
there is no proof of such exhaustion of margin, and there
was a special agreement on part of Russell & Potter with
Heard, admitted in their letter to him, dated July 4, 1873,
as follows: "You can order the cotton to be received when
tendered and sold as spot cotton, and this we advise," etc.,
and requiring no additional margin, and yet the report holds
that although he followed this advice, the cotton was sold
at heavy loss, because he did not put up additional margin,
etc., etc., etc.

When the case was called for trial, jury empanneled, etc.,
the court refused to hear argument on these exceptions, and
overruled the same, and this is complained of.

The court allowed the report, without amendment, or
erasure to be read, as pleadings and as evidence; and this is
complained of.

The evidence was voluminous, and is omitted as unneces-
sary to an understanding of the decision.

After argument by counsel, the court delivered the fol-
lowing charge to the jury:

Heard *vs.* Russell & Potter *et al.*

" GENTLEMEN—In order that you may properly discharge the duties incumbent upon you to find a verdict according to the law given you in charge, you must take the law from the court. By the law, it is the duty of the judge presiding to give the law to the jury, and the jury must be governed by it, whether it is correct law or not that I give you, it is ·for another court to say·; you are bound by it. And, first, you must ascertain who are the parties to this case and the relation they bear to each other. I don't mean the parties mentioned in the bill, whether Heard or Russell & Potter are parties, but I mean the true position of the parties to each other. Then the next thing is, what was the contract? If you find by the evidence that this was a contract made by the plaintiff with the respondents, Russell & Potter, to have purchased for him in Liverpool 2,000 bales of cotton, and that the cotton was to be purchased and received by those parties over there, then, if they disclosed his name, and he adopted that person as his agent· there to purchase, then it was a transaction made through Russell & Potter with the persons in Liverpool, and that would make the parties in this suit complainant; and Leech, Harrison & Forwood, Russell & Potter being the agents for both parties. And now you are to determine that from the evidence in the case, the contract, receipts, and all subsequent action of the parties, and thus determine what kind of a contract that was, and the relations the parties sustain to each other. I will repeat: if you find this was a contract made for the complainant with the parties in Liverpool through Russell & Potter, and that Heard recognized them, then Leach, Harrison & Forwood are the real parties with complainant, and Russell & Potter are not liable for the acts of the Liverpool persons; but if Russell & Potter agree to purchase this cotton for Heard at $5 per bale, they are principals, and the parties over there were only their agents in Liverpool. Now, if Leech, Harrison & Forwood and Heard are the principals, then the agents here, Russell & Potter, are only responsible to Heard to do as they were directed, and obey

his instructions, and if they failed to do this, they are liable for whatever damages Heard may have sustained thereby; but for the failure of the Liverpool house to obey these instructions, they (Leech, Harrison & Forwood) are responsible, and not these defendants. Now, all this is on the idea that this was a legal contract that could be enforced. There has hardly ever been a gold, or silver, or paper dollar but that somebody has tried to counterfeit it; sometimes the difference between the genuine and the counterfeit is so close that a person has to be an expert to detect it. I have been often imposed upon myself. I mean by this to say, that there are genuine contracts for future delivery. The necessities and wants of the commercial world require them. If, for instance, a capitalist wants to make a contract to sell a million dollars of goods. He sets down : my capital in these mills is $500,000. Now he can estimate the expenses of the raw material. He then goes to a responsible house and can make a contract with the party to deliver him in May, June, July, August, September, or October 2,000 bales, or 10,000 sides of leather, etc. "How much is it?" he asks. "Ten cents a pound." Then he can make a calculation and contract with the buyer. This is an honest contract for future delivery, and is recognized by the laws of Great Britain, or any other country. But now comes in this counterfeit— this imitation. The decision of Parker was good in the case of a genuine transaction, which is fair and legal. In comes a fellow who wants to make a contract for future delivery, saying: "I'll make a spec on this business." His business is not legitimate. He is the counterfeit of the honest dealer or contractor. He is a disorganizer of trade. He interferes with the natural laws of trade. He injures the interest of every honest workingman in the country. Their interests are disorganized by this class. He clogs the whole system of honest labor and capital. It is gotten up by brokers, sharpers and blacklegs to speculate on something they have not, or don't expect to have. But it sometimes is said that the business is governed by rules. So is "seven-up" governed

by rules. A jack can take a ten, a king a queen, and an ace can take a king. It has been called disreputable; there are marked cards; some fellows can deal a trump whenever they want to. So has " draw-poker" rules, like as gambling in futures has rules. They say this future business is fair. So is " seven-up" if a fellow deals fair hands. I think the paste-board gambling is the best of the two. In " futures," a man gets up his $5,000 or $10,000, or more, and when it is gone he is led along to put up more to " to keep his margin good." When he can go no further, he can be closed out. In paste-board gambling, it only takes the pile a man has up; but in this future gambling, they keep calling on their victim to " keep up his margin," until he is squeezed as dry as a lemon. Often young men—clerks, who get $50 a month—put $25 in futures because they can buy five bales of cotton. Probably he keeps the boarding house keeper out of what he owes; the boarding house keeper is thereby embarrassed. The next month he has to put up $25 " to keep up his margin." Again his board is not paid, and soon he gets to taking money out of his employer's drawer, and yet this kind of gambling is called legitimate and proper. I say it is more pernicious than paste-board gambling. Hence I thought that, as judge of this circuit, whenever this sort of gambling—this Wall street gambling—was developed in a case brought before me, I would set my face against it. If this was a transaction of this sort, in which there was to be no delivery of cotton, I charge you that it is against the policy of the law of every country that expects and wants a man to work honestly for a living. If that is not the nature of this contract, what is its nature? There was a case tried here once before—I needn't name the parties. It is unfortunate that all the courts are human nature, more or less liable to be influenced by the consideration of the parties in the case. It is unfortunately the case. The supreme court decided that the parties who acted as agent for this party, and had expended money for him in business, were entitled to all the money they had

expended for him in that trade. For instance, if Russell & Potter received $25,000 or $30,000 of Heard's money, and have transmitted that money in accordance with Heard's knowledge, direction and instruction, or subsequent ratification, he cannot recover. That is what they decided in the Hewitt case, and this case is all fours with that. If they have appropriated $35,000 in gambling in Liverpool, or anywhere else, with Heard's knowledge or consent, if he subsequently recognized it, he cannot recover any money back. If they hypothecated the bonds of Heard in this sort of a transaction prior to the commencement of this suit, then he is not entitled to recover one cent back. Well, how about this claim in set-off of some $6,000 found against Heard by auditor's report? To enable them to recover, they must show that the money was paid out at the request of Heard. If this is that class of contracts, if they paid it out without the direction of Heard, or he has not ratified it since, they are not entitled to recover it back. To enable them to recover, they must have paid the money out at Heard's direction, instruction, or subsequent ratification. To find the balance against Heard depends on two things—that the contract was legitimate, and, if a legitimate contract, there had been no fraudulent practice, or disobedience of instructions. If you find it was a legitimate contract, and there was no fraud, then they are entitled to recover every dollar of it, and interest. I have now given you what I consider the law applicable to the case, and you are to apply it to the facts. I don't understand the meaning of the word "margin," as now used. It used to be considered to be the margin or difference in price on articles between two places, Augusta and Savannah, New York, etc. That is a legitimate margin. A man found that an article was higher in one place than in another, and he would buy and ship to the place where it was highest, and the difference between price paid, and expenses added, and the price for which 'twas sold, was the margin. If by term margin is meant the difference between the price paid and

the market price at the day, then I can understand it. But this agency to buy and sell cotton at 9d. and 10d., when there is no cotton in hand, and the seller must buy to fill his order, and may deliver at his option within periods stated, is a speculation on chance, and money put up to meet the chances in the price of the market is a margin I don't understand, and the law don't recognize in these transactions. It always seems a one-sided, jug-handled sort of business. It's always more margin, more bonus. It is to the interest of the state and the people of Georgia to prevent all this kind of Wall street gambling.

After the charge the jury retired, found and returned the following verdict: We, the jury, find for the defendants the amount of $6,753.83, with interest from September 28th, 1875."

Complainant duly moved for a new trial, on the following grounds, in brief:

1. Because of the appointment of the auditor.

2. Because the auditor passed upon questions of fraud, misdirection, disobedience of instructions and bad faith, against objection and protest.

3. Because the court refused, on the trial, to allow complainant's counsel to be heard on the exceptions to auditor's report, although it was shown that the auditor passed on questions of fraud and other issues besides accounts.

4. Because the court allowed the report to be received as pleadings and as evidence.

5. Because the court overruled the exceptions (hereinbefore stated) to the report.

6. Because the court allowed defendants to use as evidence their entire answer, because complainant had used those portions admitting that Leech, Harrison & Forwood were their agents.

7. Because, against objections of complainant's counsel, the court requird Heard to answer whether or not he had engaged in similar transactions before, and successfully, his answer being in the affirmative.

8. Because the court overruled the objections of complainant's counsel to the admission of letters written by Russell & Potter to Leech, Harrison & Forwood, and from Leech, Harrison & Forwood to Russell & Potter, and from Russell & Potter to Heard; and also erred in refusing to rule out four of them that had been read (dated May 21, June 6, July 3 and July 24), on motion of complainant's counsel. These letters were written—many of them—after Heard's cotton had been ordered by Russell & Potter to be sold to protect the Liverpool house, or rather after Russell & Potter had telegraphed Leech, Harrison & Forwood early in July, 1873 : "Heard refuses to put up more margin. Protect yourselves."

9. Because the court erred in refusing to give the following request, duly made by complainant's counsel : "If Russell & Potter, or their agents, Leech, Harrison & Forwood, disobeyed Heard's orders to receive when tendered·and sell as spot cotton, Russell & Potter are liable for all damages proven to have been thereby occasioned." There was in evidence a letter from Russell & Potter to Heard, dated July 4, 1873, offering him three plans, and advising him to adopt the last, to "receive when tendered and sell as spots." He, as by letter of July 5, 1877, shown, adopted this advice. Their telegram to Leech, Harrison & Forwood was sent forward July 5, 1873. Leech, Harrison & Forwood were their agents. If sold at once, loss would have been covered by margin and $103 more. [See said letter of July 4, 1873.] The sales were not made at once, but were not completed until September 30, 1873. The loss claimed against Heard is $6,753.58.

10. Because the court, in giving the charge that, "If, however, you find that $24,000 had been paid in good faith before suit, and $11,000 remained in their hands until after suit, it is a fund in court subject to Heard's claim," erred in saying : "But I give this charge with the qualification that the $11,000 remaining in their hands had not been, with the knowledge or consent of Heard, hypothecated to raise

funds to be forwarded. If this had been done, then the $11,000 and the $24,000 go together."

11. Because the court erred in charging, at defendants' request: "The complainant cannot take advantage of his own failure to testify before the auditor, if it appear that he was present and failed to testify," and also in adding: "He can't claim anything by it, if he had the opportunity and failed to avail himself of it. He had the chance to put in his evidence, and didn't do it. It cannot affect the auditor's report; he is bound by it."

12. Because the court erred in charging, at defendants' request: "If the contract, when made, was reported to Heard and he ratified it, the contract was his and he was bound by it."

13. Because the court erred in charging the jury, at request of defendants' counsel: "Factors have a general lien for all advances made, and have the right to sell to secure themselves from loss when, in their judgment, it is necessary, to save themselves from loss."

14 and 15 Because the verdict was against the evidence, the law, the charge of the court, etc. The charge to the jury, hereinbefore set out, was made part of the motion.

After argument, the court, on the 22d day of January, 1877, rendered the following decision :

"I am fully persuaded, from the evidence disclosed in the case, that the transaction was a clear case of gambling in the sales of cotton for future delivery, and that, like most persons in gaming or betting against a fixed game, the better is bound to lose. That this species of gambling is against both public morals and policy, I have never entertained a doubt. The producer of cotton, when he goes to market to sell, is met in the market by a man who has no cotton, but can sell for future delivery more cotton than a state can produce, and when his contract matures, can settle the difference between the then ruling price and the contract price, if his margin of ten per cent. is good for it. In this it is injurious

to the honest, hard-worked producers by increasing the number of sales to fabulous amounts, and thus it interferes with and disturbs all legitimate business and trade. A farmer comes into town with a load of corn, and when about to sell it at 60c., one of these huckstering sellers for future delivery comes up and says, "I will deliver you what corn you want next week for 50c.," and compels the farmer thus to take 50c., and this is quoted as the market price until other markets, by selling or purchasing, regulate it. If seven-up, poker, faro, or any other game played with cards, is demoralizing on account of the betting carried on, why is not this betting upon the price of cotton at a future day? And what can be said to be more fair than a game when each party can alternately shuffle and deal the cards, and after looking at his hand, exercise the privilege of betting or not, and naming your amounts, etc., and when you get broke, or spend your cash in hand, quit?"

"In this game of futures you seldom see or know the man with whom you are betting—never seeing the stakes on one side, and can continue to bet as long as the margin is held good; thus decoying the victim by small sums or stakes until he is forced to turn loose himself and allow his antagonist to settle up, sell out and manage things all his own way, and furnish you with his statement of accounts and balance sheet, and perhaps your own agent enjoying with your antagonist a portion of the proceeds of commissions or profits. This game, too, is legitimate, and opens the door to demoralize even the elect. For myself, I feel fully assured in saying that a more injurious traffic or business to the public interest has not been carried on in my day, and that it is equally demoralizing with every species of gaming, and more dangerous. In this case, though it seems to have been carried on through an agent, as perhaps it is in every case, our supreme court held it to be legitimate, and, in a more recent case, held that settlements between buyers and sellers of futures could not be changed, thereby seemingly

affirming the previous decision of the court, and even going further. I must, therefore, in deference to the decision of that court, yield my own personal judgment, until the legislature, by proper enactments, shall place this traffic where it properly belongs—in the tenth division of the Penal Code. The motion for a new trial is, therefore, refused on all the grounds taken."

To this decision complainant ex+cepted.

HOOK & WEBB, for plaintiff in error.

FRANK H. MILLER; J. C. C. BLACK, for defendants.

JACKSON, Judge.

This was a bill filed by Heard against the defendants, for an account of moneys received by Russell & Potter from him and expended by them through Leech, Harrison & Forwood, of Liverpool, England, in the purchase of cotton for him. The immediate purpose of the bill, it seems, was to enjoin Russell & Potter from selling securities put in their hands by Heard as margin to cover losses in the purchase of futures in cotton. The main allegations in the bill were that they (Russell & Potter) had disobeyed the instructions of Heard, after inducing him to cover margins from time to time, amounting to some thirty-five thousand dollars, and that thus he had been damaged by them, and the prayer was for account, and relief, and injunction against selling the securities.

The bill waived discovery, but the defendants answered fully, putting in issue most of the allegations in the bill.

After the issues were made and testimony taken, the defendants, who had set up their account against Heard, and who claimed an indebtedness to them on a long account of purchases of 2000 bales of cotton and repurchases of future deliveries to cover losses from time to time, cable-grams and telegrams, and expenses of like character, asked, for an auditor. The chancellor appointed an auditor over

objections of complainant, and he excepted, filing an inter-
locutory bill of exceptions.

When the auditor's report was filed in the clerk's office,
no order was taken thereon, allowing the same or approving
it, or giving time to except thereto, but exceptions were
filed thereto by the complainant, mainly on the ground that
the auditor transcended his powers, and reported an argu-
ment or conclusion on fraud and failure to follow instruc-
tions rather than, or in addition to, a statement of an ac-
count proper between the parties.   These exceptions were
filed in vacation, but the report was returned and filed in
the clerk's office, and no order taken thereon to show that
it was returned in term.

At the next term thereafter, the case came on for a hear-
ing, and the jury, under the charge of the court, brought in a
verdict of upwards of six thousand dollars against Heard, as
balance due Russell & Potter by him, for moneys paid by
them to Leech, Harrison & Forwood.   A motion was made
by Heard for a new trial, on various grounds therein set out.
It was overruled, and the complainant excepted.   The ques-
tion is, did the court err in refusing to grant a new trial
on any of the grounds taken in the motion, and on which
error is assigned here ?

The first ground is, that the court erred in the appoint-
ment of an auditor.   Inasmuch as no assignment of error
thereon was made on the original interlocutory bill of excep-
tions, the point was made that this could not be made a
ground for the grant of a new trial, and error be assigned
because the court refused the new trial on the error commit-
ted—if one was committed—at a prior term of the court.
There was doubt on our minds about this point; but, on re-
flection, we do not see why the appointment of an auditor
at a previous term should not be made a ground for a new
trial, when his report was read in evidence, and may have
controlled the verdict of the jury.   The judge who appoint-
ed the auditor, though not the same individual who tried

the case, was the same court, the same official person ; and
if the court had erred at any time in the progress of the
trial, we do not see why it could not correct the error after
trial on a motion for a new trial.   Of course the party must
except, and put the point on record, so as to perpetuate the
exact memory thereof ; but the same point thus perpetuated
of record, may be renewed, on the motion for a new trial, so
as to allow the court, if it will, to correct then the error it
had previously committed, if error it was.   Inasmuch as if
it were error, this court would, on appeal to it, order a new
trial, we cannot see why the court below could not, on re-
flection, do the same thing ; just as it often does correct, on
such a motion, its errors in admitting or rejecting evidence,
or in its charges to the jury.

The fact is, that the trial of a case may be said, with pro-
priety, to embrace the entire proceedings, from its first foot-
ing in the court to the final exit therefrom with judgment ;
and the motion for a new trial may well embrace every act
of the court, from inception to verdict, if excepted to at the
time the error was committed, or alleged to be, and spread
on the record for certainty that it occurred as alleged in the
motion for new trial.

2.  But conceding that the assignment of error is properly
and substantially made on this interlocutory bill of excep-
tions, did the court err in appointing the auditor ?   We all
think that it did not err.

This bill does involve accounts and long accounts be-
tween these parties.   Its prayer, among other prayers, is for
general account.   It was, therefore, in the discretion of the
court to appoint an auditor in this case against the wishes
and assent of either party.   The act of 1871 fully embraces
such a case.   It is true that this court held in Vanduzer's
case, in 37 *Ga.* 299, that an auditor could not be appointed
except on consent of parties, but the act of 1871—see Code
§ 3139 and acts of 1871–2, page 54—embraces cases of ac-
count, and enables the court to appoint an auditor with or

without the consent of the parties. It was right then that the court should appoint the auditor. Nor does it matter on what testimony, or from what sort of examination of the case, thorough or cursory, the appointment was made, provided always that the case authorized it. The court should satisfy itself. If it judged wrong, its judgment can be reviewed here, and in the event its discretion were abused in appointing an auditor in a case not authorizing such appointment, or in appointing an improper person from bias or want of capacity, its decision could be corrected. The presumption is that every man occupying the exalted and reponsible position of judge of the superior courts, with the eyes of an enlightened and vigilant bar ever upon him—a bar who are his judges, and by whose judgment his character, judicial and personal, will be weighed by the community—will discharge this as every other duty—fearlessly and impartially. And the presumption is that the auditor so appointed, usually a member of the bar, will discharge his duties with like impartiality—seeing that he too is surrunded by his peers, his brethren of the bar, and that his professional reputation is staked upon his conduct in the semi-judicial character in which he is called upon to act.

3. But when the case came on for trial, the report of the auditor came up for consideration; and certain exceptions thereto, filed in vacation between the term when the report was filed, if in term, or the time when filed, if in vacation, and the term of court when the case was called, and these exceptions came before the court, and the court thereupon overruled, or dismissed, to use the language in the record, the exceptions; and this is another ground of the motion for a new trial on which error is assigned; and then, instead of entering a decree on the report of the auditor, as provided in section 4206 of the Code, or if the case was tried at all, trying it under section 4203 of the Code, upon such exceptions of fact as were taken to the auditor's report, the court tried the case before the jury generally, and allowed

the entire auditor's report, on law and evidence, to go to the jury as evidence.    And upon all this error is assigned.

Section 4203 is imperative in respect to the mode of trial. It declares that "the exceptions *shall be* the *only* issues of fact submitted to the jury, and the jury *shall* return a verdict on each exception *seriatim.*"

Upon what ground the whole body of complainant's exceptions was dismissed, the record does not disclose.    It must have been because not filed in time, or filed in vacation, we suppose.    No time had been fixed for exceptions to be filed by any order disclosed in the record, as should have been done—see Code, §4203—and none being prescribed, as the exceptions were filed in the clerk's office some time before the trial term, we think that they were in time. Nor are we aware of any law, or practice, which requires the exceptions to be filed in term only.    Usually, so far as the practice has come under our observation, when the report is made, the court orders it filed for inspection of parties, and in the order prescribes a certain time in which exceptions thereto may be made and filed by either party; and this seems to us the better, if not the necessary practice as indicated in section 4203 of the Code.    As no time was fixed, and no order made requiring the parties to except in term or vacation, and what time in vacation, we do not think that it was right to dismiss all the exceptions for either of these reasons.

On examining the exceptions, while some are exceptions of law and others of fact, it must be confessed that they are much intermixed; yet, we think that there are some naked questions of fact made by the exceptions, which the jury ought to have passed upon.    The proper course to be pursued by the judge, we think, was to have decided himself the questions of law made by the report, and to have eliminated from it any errors found in the report suggested by those exceptions; and then to have submitted the exceptions of fact to the jury—to be passed upon by that body, and a

verdict rendered on each exception *seriatim.*   See §§ 4202, 4203, 3097, 3138, 3139 of the Code.

On the trial before the jury, as has been often held by this court, and as the Code expressly provides, the report on the facts—the finding on them by the auditor—is *prima facie* evidence on the trial of the exceptions before the jury; but the entire report on law and fact, including the argument of the auditor on legal questions, while proper for the consideration of the court on the legal exceptions, of which he alone judges, is not evidence for the jury, and should not have gone to them—especially as the trial was a general one, and not on the exceptions.   See Code, §4203, and 47 *Ga.,* 414–434; 655 *Ga.,* 28; 57 *Ga.,* 142.

4. In respect to what is proper matter to be passed upon by the auditor under the act of 1871, we think that it is the statement of account between the parties, and all facts necessary to be found in order to make that statement and arrive at the just balance between them.   If, in a long and complicated account, any item thereof be attacked as unlawful, or unfounded in truth and fact, then the auditor must determine the legality thereof, for final judgment by the chancellor, if excepted to, or the truth and fact thereof, for final settlement by the jury, if excepted to.   For this purpose he may consider evidence, either written or oral, and determine the truth in his judgment of each contested item, and his ascertainment thereof is evidence *prima facie* for the jury.   It will be seen by reference to the act of 1871 (stat. 1871–2, p. 54, Code, §3139), that it vests in the court power, at its discretion, to appoint an auditor at law, or in equity, to report upon matters of account, as formerly, by the decision in Vanduzer's case, could only be done by consent of parties; and that the auditor's proceedings, and the effect thereof, was to be the same in this case and under this statute as before by consent; for that act distinctly refers to §3082 and §3083 of Irwin's Code for guidance, which are §3137 and §3138 of the Code now in use.

In construing this act we must look at the old law, the

mischief and the remedy. The old law was, that an auditor could be appointed only by consent of parties. The mischief was, that sometimes a party was obstinate; that a jury could not well ascertain the account in the hurry incident to their investigations; that the judge saw that the case demanded a close sifting and settlement, or ascertainment, of the account and its items, and, in his judgment, an auditor was needed, and then, as the remedy, the statute declared that he could appoint one, without consent, to do what formerly auditors, with consent, could do.

Of course, as by consent formerly the powers of the auditor could be restricted to the mere calculation of arithmetic, if it pleased the parties, so now the same can be done by the court under the act of 1871. In this case the order is quite general, but we think that its true intent was to invest the auditor with the power to investigate and state the account, and ascertain the facts necessary to that work, and to go no further.

5. When the report was in evidence—all of it, argument and legal decisions and all—the court told the jury that the complainant, Heard, *was bound by it.* It seems that Heard had not been sworn before the auditor as a witness, and some point had been made thereon, and in charging upon that circumstance by request of defendants, the court used the language. It was too strong entirely. If Heard were bound by the report, of course he could not get around what it found; whereas, the law makes the report on the facts submitted, only *prima facie* evidence. This report contained argument and law, and this charge bound Heard by that argument and that law.

6. The complainant waived all discovery, but used a portion of the answer to show that Leech, Harrison & Forwood were the agents of Russel & Potter, and offered portions in evidence therefor; whereupon the court, on motion of defendants, allowed all the answer to go in as evidence.

We approve this ruling of the court. If one party introduce part of a letter or other writing, the other may use

the remaining part.   The rule should be stronger, or rather the reason therefor is stronger in case of the answer of defendants where discovery is waived.   The complainant said by his waiver, "I can get along without your answer; I need none of it," and he thereby deprived defendant of the great advantage of having his answer to be equal to two witnesses or one witness and strong corroborating circumstances; but at the hearing he was obliged to use a part of the answer, or at least he did so.   When he did, he opened the whole answer for the use of defendants as evidence—not, indeed, as if no discovery had been waived when it would have been equal to two witnesses, but as equal evidence with the part put in by complainant.   We think the court did right so to rule.

7. Inasmuch as the question at issue involved imposition upon Heard by these factors and dealers in cotton, we see no error in allowing the defendants to show that he had dealt in cotton largely and was no tyro in the trade. Whether he had been a successful dealer or not might, perhaps, have been properly ruled out, but take it altogether we think there is nothing valid in the objection—certainly not enough to authorize a new trial on such a ground.

8. The bill quoted certain letters from Russell & Potter, and they were relied upon.   The court allowed the defendants to put in their entire correspondence with Heard, and with Leech, Harrison & Forwood, their Liverpool correspondents, about Heard's business touching this cotton transaction.   It seems to have been the only way to open the whole case to the jury.   It was the current history of the trade and its execution.   It showed what Heard thought about cotton, and did, and ordered done ;  what Russell & Potter directed the Liverpool men to do ;  and what the Liverpool men wrote and did.   The letters were properly admitted.

9. The request to charge, that " if Russell & Potter, or their agents, Leech, Harrison & Forwood, disobeyed Heard's orders to receive when tendered, and sell as spot cotton, Russell & Potter are liable for all damage proven to have been

thereby occasioned," without more, was properly refused ; because whether or not they ought to have received and sold would depend upon many other things, to-wit : the contract, the understanding about margins being kept up, and the right of the factors, under such contract, to sell before delivery, and not as spot cotton, to save themselves, if such were the contract.

10. Nor do we find any error in qualifying the fifth request to charge. That request was, " If, however, you find that $24,000 had been paid, in good faith, before suit, and $11,000 remained in their hands until after suit, it is a fund in court subject to Heard's claim," which the court gave, but qualified by saying, " but I give this charge with the qualification that the $1100 remaining in their hands had not been, with the knowledge and consent of Heard, hypothecated to raise funds to be forwarded ; if this had been done, then the $11,000 and $24,000 go together." The idea of the request was, that if money had been *bona fide* expended by Russell & Potter before Heard sued them, in reimbursing their correspondents and themselves, they might be protected for such expenditure ; but not in regard to securities in their hands, after suit. The court told the jury that if these securities had been pledged by Russell & Potter, with Heard's consent, to raise money to be sent forward to Leech, Harrison & Forwood, then such fund so pledged was like the money sent on, and must share the same fate. It seems right.

11. We see no error in the charge, that if Heard ratified the contract when reported to him, it bound him.

12. As a general rule, factors have a general lien for all advances made, and the right to sell to secure themselves from loss ; but if they agree not to sell except in a particular way, then they are bound by the agreement. It follows that, as in this case, the complainant contended that there was such an agreement, the charge that they had such a lien was too broad, unless qualified by the addition, that though

such is the general rule, the contract, if there be one proven to the satisfaction of the jury, must govern.

13. This suit having been brought by a party to recover from the agents certain moneys intrusted to them, to buy cotton on future delivery, and the agents having set up that the principal owed them money for losses they had sustained in buying the cotton for the principal, the law of the case and the legality of the recovery has been settled by this court in 45 *Ga.*, 507; and while we regret that the decision then rendered by this court, as at that time constituted, does not meet the approbation of the able and experienced judge who presided in the court below in the case now under review, he will, we are sure,'pardon us for reminding him that the judgment binds this court, as now constituted, as well as the superior court of the Augusta circuit, and that it can do no practical good to indulge in philippics before the jury against either the correctness or the morality of the law as then expounded. The decision complained of and inveighed against is a unanimous judgment, and until deliberately reviewed and overruled, it is as binding as an act of the legislature. Code, §217. No request has been made of this court to review it, and we shall remain satisfied with and will feel resigned to enforce it, until it has been so reviewed and overruled; and we commend the like resignation to the court below.

Whilst if fully and fairly tried, the verdict of the jury in this case may be the same as rendered on this trial, yet, inasmuch as the case has not been tried according to law in our judgment, and the court committed error in respect to the auditor's report, and in charging that Heard was bound by it, and in not allowing the issues of fact made in the exceptions to that report to be passed upon *seriatim*, and in admitting the whole report to go to the jury as evidence in a case not tried on the exceptions to it, we reverse the judgment, and grant the complainant a new trial.

Judgment reversed.